Filed 1/9/23 P. v. Maciel CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B314126 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. VA066518 |
| LUZ MUNOZ MACIEL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Lee W. Tsao, Judge.  Reversed and remanded with instructions.

Miriam K. Billington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

# INTRODUCTION

In 2021, appellant Luz Munoz Maciel filed a motion to vacate her 2001 conviction for brandishing a firearm at a motor vehicle occupant. She claimed defense counsel gave incomplete advice as to the adverse immigration consequences of her no contest plea and failed to investigate and negotiate an immigration-neutral plea agreement. After argument, the trial court denied the motion and appellant now appeals.

We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

I.    2001 Conviction for Brandishing a Firearm

On July 31, 2001, the People filed a complaint against appellant, charging the following: Count 1—carrying a loaded, unregistered firearm, in violation of Penal Code[2] section 12031, subdivision (a)(1); Count 2—child abuse (as to her minor son), in violation of section 273a, subdivision (a); and Count 3—brandishing a firearm at a person in a motor vehicle, in violation of section 417.3.

Arraignment took place on July 31, 2001. Appellant was present in court with private counsel Lorenzo Pereyda and pled

---

[1]    We note three motions to augment the record on appeal were filed. On December 28, 2021, we granted appellant's motion to augment filed December 27, 2021. On April 20, 2022, we granted respondent's motion to augment filed April 1, 2022. On April 26, 2022, we granted respondent's motion to augment filed April 5, 2022.

[2]    Undesignated statutory references are to the Penal Code.

not guilty to all three counts with the assistance of an official Spanish language interpreter.

The early disposition hearing took place on August 29, 2001. The minute order specifies that "no offer reached" during the hearing. We have no other information about that hearing and can only speculate about whether and how plea negotiations proceeded.

At the preliminary hearing on September 17, 2001, appellant was present in court with private counsel Catherine Case. The court heard from three witnesses—Olivia Heredia, Angel Rocha, and Officer Gilbert Jara.

Olivia Heredia (Heredia) testified that at approximately 1:40 p.m. on July 28, 2001, she was in her car, parked in the driveway of the apartment building where she resides, waiting for her children to come down so they could go swimming. While waiting, she heard a car honk twice, looked in her rearview mirror, and saw appellant in a big, black truck pull into the driveway, right behind her car.[3] Appellant "honked the horn at me to move" so "I started my car, and I went all the way to the carport, and I parked the car." She remained seated in the car, "waiting for [her] kids to come out." When Heredia's children came down and sat in the backseat of the car, Heredia saw appellant's boyfriend Filiberto Porcayo (Porcayo)—seated in the passenger seat of appellant's truck—get out and approach the driver's side of Heredia's car. Porcayo asked Heredia, "Why don't you just fight her," meaning appellant. Heredia noticed Porcayo

---

[3] Appellant and Heredia live in the same apartment building and are neighbors. Appellant's and Heredia's "little boys used to play" together.

3

was intoxicated; she also noticed appellant's "little boy" was seated in appellant's truck.

Appellant then got out of her truck with a "silver and black" gun and "swang it around" while Porcayo "kept telling [Heredia] to fight [appellant], knowing that [appellant] had the gun." Appellant "was intoxicated" and "waving the gun around"; appellant "was asking me to fight her, and my kids were already in the car, and they [saw] the gun." At some point, appellant pointed the gun at Heredia. Heredia's "kids started crying and freaking out" so she "was trying to calm them down, and that's when [her] husband walked out" and saw appellant with a gun. He headed back to the apartment to call the police but Porcayo followed him, "telling him not to call the police." Appellant drove off, and Heredia, still in the carport, heard "three gunshots go off" from the direction of appellant's truck.

Heredia's husband, Angel Rocha (Rocha), testified next. On the date in question, Rocha was walking towards the carport when he noticed appellant pointing a "black, chrome and automatic" gun at his wife. Rocha "got mad." Porcayo said something to appellant, prompting her to put the gun away "in her waistband." Rocha announced he was "going to call the cops," but Porcayo grabbed Rocha's forearm and insisted, "You ain't going to do nothing. You're not going to do nothing, nothing." Porcayo was "buzzed" and "drunk." Rocha felt "threatened" because Porcayo said his home boys would "get" him and he was "always bringing up he's in a gang." He then saw Porcayo get in appellant's truck while he relayed to "the [911] dispatcher the license plate" information. About 15 to 20 seconds after appellant and Porcayo drove off, Rocha heard three gunshots from the direction of appellant's car.

4

The third and final witness was City of Bell Police Officer Gilbert Jara. He conducted a traffic stop on a black Navigator, with appellant in the driver's seat and Porcayo in the front passenger seat. Officer Jara recovered a loaded handgun about 200 to 250 feet away from appellant's vehicle. Officer Jara's partner saw appellant's 10-year-old son "inside [the truck] still, almost laying down" and asked him to come out. Appellant's son complied, and while running towards the officers, "something fell from his pant and it was a magazine from a gun." Officer Jara picked up the "magazine with nine[-]millimeter copper-type bullets."

The court held appellant to answer on all three counts. The court further found appellant in violation of probation and ordered her to serve 60 days in county jail.

On October 1, 2001, the People filed an information with three counts and an additional count—assault with a semiautomatic firearm, in violation of section 245, subdivision (b), also a felony. It was further alleged appellant personally used a firearm, within the meaning of sections 12022.5, 1192.7, subdivision (c), and 667.5, subdivision (c).

On October 29, 2001, new private counsel Edward A. Esqueda (Esqueda) relieved appellant's prior counsel.

During the plea proceeding on December 5, 2001, appellant was present in court, represented by Esqueda and assisted by an official Spanish language interpreter. Appellant withdrew her plea of not guilty to count 3 (violation of section 417.3— brandishing a firearm in presence of motor vehicle occupant) and pled no contest. In exchange for appellant's no contest plea to count 3, the People agreed to ask the court to sentence appellant

5

to the low term of 16 months and to move to dismiss the remaining counts.

At the plea, the prosecutor advised appellant of the effect of a no contest plea, including: "[I]f you are not a citizen of the United States, conviction of this offense will result in your being deported, being denied the right to become a citizen, or, if you leave the country, being denied the right to reenter." However, the *Tahl*[4] waiver, which was translated for appellant and signed by her as part of her plea, stated: "I understand that if I am not a citizen of the United States, the conviction for the offense charged *may* have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (Italics added.) The minute order memorializing the plea also states that appellant was advised that she *may* be deported as a consequence of the plea. The court found each such waiver "knowingly, understandingly, and explicitly made." When asked if appellant plead "freely and voluntarily and because [she] believe[d] it's in [her] best interests to do so," she answered, "Yes."

During the plea, the court asked appellant whether she had had a chance to discuss any defense she might have with her attorney. Appellant told the court she had not talked to her attorney "about this," and that she had spoken to her attorney a "little" about the case. Appellant's attorney then volunteered to the court: "Your Honor, I can represent to the Court that we have thoroughly discussed this case. [¶] She is one of these very difficult clients. She thinks she is getting, for lack of a better term, shafted in this case. [¶] She doesn't realize her exposure of

---

[4] *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*), overruled on other grounds by *Mills v. Municipal Court* (1973) 10 Cal.3d 288, 291.

19 years.  Unfortunately, she has no record, and because of that, she's never had any problems.  [¶] The People have made a very generous offer, and I've encouraged her to accept that offer.  She understands everything in my opinion, and she's willing to accept the deal."  The court asked appellant if she wanted to go forward with the agreement.  She answered, "Yes.  I want to finish this."

The court accepted appellant's no contest plea to count 3 and sentenced appellant to the low term of 16 months in state prison, with 196 days of custody credit.  The remaining counts were dismissed.  Appellant was ordered to pay a restitution fine for $200 and a parole restitution fine for $200.

## II.    2021 Motion to Vacate

On March 9, 2021, appellant filed a motion to vacate her 2001 conviction pursuant to section 1473.7.  Appellant argued the no contest plea was legally invalid for three reasons: (1) defense counsel failed to advise her that accepting the People's plea offer would make it impossible for her to defend against deportation; (2) defense counsel failed to properly defend against the immigration consequences of the plea; and (3) appellant subjectively misunderstood the adverse immigration consequences of her plea due to defense counsel's incomplete advice.  Appellant argued defense counsel "failed his duty . . . by not also distinguishing the charges that were aggravated felonies."  Appellant argued she would have rejected the plea had she known it would prevent her from being able to fight deportation and that there was an immigration-neutral alternative.  Appellant argued these prejudicial errors warrants vacatur per section 1473.7, as she is now prevented from becoming a U.S. citizen and is in fear of deportation.

7

In support of her motion, appellant submitted her sworn declaration, a declaration from attorney Amanda Schuft, and a declaration from Esqueda.

Appellant's sworn declaration set out the following facts. Appellant is a citizen of Mexico, where she was born in 1964. She came to the United States (U.S.) in 1978, when she was 14 years old and seven months pregnant; she had left her husband Enrique, who beat her. She became a U.S. legal permanent resident through amnesty under President Ronald Reagan. She applied for U.S. citizenship in 1999, but "did not know enough English to qualify." While finalizing her divorce with Enrique, she started going out with Porcayo, who she described as "a bad guy, very violent" and a "gang member." He "hit" her and previously threatened to kill her. Despite this, she "was with him for 14 years because [she] did not know how to leave."

According to appellant, during the 2001 incident, it was Porcayo who "pulled out the gun and shot into the air." She then "grabbed the gun out of his hands" while the neighbors (Heredia and Rocha) ran to call the police. She threw the gun out of the car because Porcayo told her to. It was Porcayo who gave the "two clips" to her son and told him to hide them from the police.

Appellant was a legal permanent resident at the time she entered her plea in 2001. Her defense counsel Esqueda told appellant the maximum time she could serve was "9 years but that he could reduce it to 16 months." He also "told me . . . when I got out of prison there would be an immigration hold on me and I would be deported." Appellant cried and told Esqueda she had five children in the U.S. and "did not want to be deported" because her "whole life was here and [she] had worked so hard for it." Esqueda recommended to appellant that she "take the plea."

8

He told appellant she could go to trial but that there was not much to fight and that she could lose and serve nine years in prison; there was "never an option that would save me from deportation."

In the declaration of Amanda Schuft, directing attorney with Immigrant Defenders Law Center, she explained appellant's 2001 conviction for section 417.3, which has a sentence of 365 days or more, is categorized as an "aggravated felony" under federal immigration law. Appellant's conviction makes her not only deportable, but also removes the possibility of any defense to deportation. "Had [appellant] pled instead to another one of the charges, [such as count 1's charge of carrying a loaded firearm,] former [P]enal [C]ode section 12031(a)(1), . . . she would not be at risk of the Department of Homeland Security initiating removal proceedings against her . . . and she would be eligible to apply to naturalize to become a United States citizen."

In the (very brief) declaration of Esqueda, he stated: "After a review of my cases, I found that [appellant's case] was shredded years ago and no longer exists. Moreover, I have no recollection of the facts of the case nor the client."

III.    Hearing and Ruling on Motion to Vacate

On May 13 and 14, 2021, the hearing on appellant's motion to vacate took place. The court remarked that it "read and considered the letters of support and the medical records. The letters of support are from individuals who know [appellant] through her church, indicating [appellant] as an active member and she contributes in a variety of ways to the church. [¶] There is also a letter from [appellant's] niece and her eldest sibling and her husband. The medical records document treatment for PTSD beginning around 2015." We recite the trial court's summary of

9

this additional evidence, as the record before us does not contain copies of the letters of support and medical records.

The court asked the People whether their file indicates that appellant was ever offered a plea to count 1. The district attorney answered: "I have reviewed the file. She was only offered a plea to the brandishing at all times."

The trial court denied the motion on the record before it and found no prejudicial error. The court stated its ruling on the record:

"*Vivar*,[5] I think, eloquently states or discusses what's at stake for a noncitizen residing in the United States who has been convicted of a crime with potential immigration consequences. [¶] [Appellant], like Mr. Vivar, has been in the country for many years, has established close and lasting ties with family and community. [Appellant] has, in fact, gone above and beyond just like Mr. Vivar by being very active in her church. She is characterized by members of her church as being indispensable to their mission, so her contributions and her family ties are undisputed."

Appellant "had no prior record. She did sign a *Tahl* waiver, which . . . indicated that she may be deported, and as . . . pointed out, that is not sufficient to adequately advise [appellant] of the immigration consequences." The plea transcript "advised that she will be deported, which is a significant fact, but, again, a factor and not necessarily dispositive in this court's view."

The court continued: Appellant's declaration acknowledges that "Esqueda told her . . . when she got out of prison, there would be an immigration hold on her and she would be deported." Appellant's counsel argues "this was incomplete because there is

---

5    *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*),

no indication that [Esqueda] advised her that a plea to the brandishing count is actually an aggravated felony." The court found "it is a distinction that does not carry a meaningful difference in this case in terms of what [appellant] was told to expect would happen if she pled no contest to the brandishing." Esqueda "was clear she would be deported . . . and that an immigration hold would be put on her. That's clear. It's clear advice about what [appellant] could expect from the plea, and in this court's view, what defense counsel told [appellant] about the immigration consequences of her plea was sufficient to advise her of consequences."

Appellant argued Esqueda "should have negotiated a plea to count 1" which "was immigration neutral." The court ruled: "The fact that an immigration-neutral offense was actually charged in the information only has, in my view, limited relevance because the argument can always be made that where a noncitizen pleads to a deportable offense that's charged in the information, defense counsel should have reached or negotiated an agreement to an immigration-neutral charge that was not alleged in the information." The "record is clear" that appellant "had no reason to believe that an immigration-neutral negotiated disposition was possible."

"[T]he effect of [charging appellant with an additional count—assault with a semiautomatic firearm] significantly increase[d] her exposure in state prison should she be convicted." Appellant "faced six years . . . for the child endangerment charge in count 2 plus an additional eight months for the brandishing charge." After being charged with the additional count and gun allegation, "she faced up to 19 years in state prison." "[G]iven the fact that the charges actually increased in this case, I don't see

11

any reason for [appellant] to have believed or, for that matter, counsel to have believed that an immigration-neutral disposition such as a plea to count 1 was possible."  The court referred to the fact that "this case settled on the eve of trial.  In fact, when the case was called for trial, [appellant] and her lawyer would have known that the time to resolve the case was quickly running out and that—a plea to count 3 seemed perfectly reasonable under the circumstances because . . . an immigration-neutral disposition was not likely at that point."

"*Vivar* is distinguishable because in that case, the defendant was actually offered a plea to an immigration-neutral sentence and counsel . . . failed to advise Mr. Vivar that by pleading to the burglary, the immigration-neutral offense, he could avoid deportation, and that's a material distinction between *Vivar* and this case."  The court found the advice given to appellant by Esqueda was sufficient to explain the immigration consequences of her plea.  "[T]here was no reason to believe that an immigration-neutral negotiated disposition was possible, and that any error that occurred was not prejudicial."

Appellant timely appealed.

## DISCUSSION

I.  Applicable Law

Mandatory deportation from the United States is an immigration consequence when a defendant is convicted of a crime deemed an aggravated felony under federal immigration law. (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187–188; 8 U.S.C. § 1228(c) [aggravated felony is conclusively presumed deportable].)  With respect to appellant's case, a violation of section 417.3, constitutes an aggravated felony, a mandated

12

deportable offense under federal law. (8 U.S.C. §§ 1227(a)(2)(A)(iii) & 1227(a)(2)(C).)

Section 1473.7 authorizes a person no longer in criminal custody to file a motion to vacate a conviction or sentence for any of the following reasons: "The conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).)

Effective January 1, 2019, legislative amendments to section 1473.7 afforded a defendant relief under the statute without a showing of ineffective assistance of counsel per the *Strickland*[6] standard. (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1005.) To establish prejudice, a defendant must show by a preponderance of the evidence that he did not meaningfully understand or knowingly accept the actual or potential adverse immigration consequences of the plea. (*Id.* at pp. 1010–1011; see *People v. Mejia* (2019) 36 Cal.App.5th 859, 862 (*Mejia*); see *People v. Martinez* (2013) 57 Cal.4th 555, 565 [defendant may show prejudice by convincing the court that he "would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow"].) A fact is proved by a preponderance of the evidence if it is more likely than not that the fact is true. (*People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003.)

The key to section 1473.7 is "the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken." (*Mejia, supra*, 36 Cal.App.5th at p. 866.) Showing prejudicial error under section 1473.7,

---

6        *Strickland v. Washington* (1984) 466 U.S. 668.

13

subdivision (a)(1) means "demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances." (*Vivar*, *supra*, 11 Cal.5th at p. 529.) Factors relevant to this inquiry include appellant's ties to the United States, the importance appellant placed on avoiding deportation, appellant's priorities in seeking a plea bargain, and whether appellant had reason to believe an immigration-neutral negotiated disposition was possible. (*Id.* at pp. 529–530.)

II.    Standard of Review

In *Vivar*, the California Supreme Court determined the standard of review for section 1473.7 proceedings and endorsed the independent standard of review. (*Vivar*, *supra*, 11 Cal.5th at p. 524.) Under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law. (*Id.* at p. 527.) Independent review is not the equivalent of de novo review. (*Ibid.*) An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. (*Ibid.*) Factual determinations by the trial court are given particular deference, even though courts reviewing such claims generally may reach a different conclusion from the trial court on an independent examination of the evidence even where the evidence is conflicting. (*Ibid.*) Where the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, the trial court and this court are in the same position in interpreting written declarations when reviewing a

14

cold record in a section 1473.7 proceeding. (*Vivar*, at p. 528.) It is for the appellate court to ultimately decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7. (*Vivar*, at p. 528.)

III.   Analysis

Appellant contends the trial court erred when it denied her motion to vacate the conviction because defense counsel gave her incomplete advice as to adverse immigration consequences and there was a viable immigration-neutral charge available (via count 1, carrying a loaded firearm in violation of former § 12031, subd. (a), which is not an aggravated felony). She argues she would have insisted on pleading no contest to a different, more immigration-neutral charge or gambled on a trial if she had known that she had no defense to permanent removal on some charges but might on others.

Section 1473.7, subdivision (a)(1), requires appellant to show that her "ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences" of a conviction/plea was damaged by prejudicial error which may, but need not, be based on ineffective assistance of counsel. (§ 1473.7, subd. (a)(1).)

We note here that defense counsel's declaration was not informative, as he had no file on appellant's matter and did not personally recall any information pertaining to his representation of appellant in 2001. On this record it is undisputed that Esqueda did not tell appellant about the true and complete consequences of her plea. Indeed, appellant's declaration states: "There was never an option that would save me from deportation." He did not tell her that by pleading to this particular charge, she was condemning herself to mandatory

15

deportation. Counsel's incomplete advisement which omitted the fact that pleading to another of the charges would not have required mandatory deportation resulted in appellant's uninformed and ignorant plea.

We are persuaded by appellant's argument that Esqueda failed to advise her fully of the adverse immigration consequences of the plea bargain. It is correct Esqueda told appellant *one* adverse consequence of her plea, that is, she would be deported. But he failed to tell her that she was also giving up her defenses to deportation, one of which was a plea to count 1, carrying a loaded unregistered firearm, which would have preserved her ability to challenge deportability.

Esqueda had a responsibility to give his client a complete advisement of *all* material adverse immigration consequences. Not telling her what immigration defenses she was giving up by her plea does not fulfill his obligation to her as counsel. To tell a client that under the plea bargain they will be deported no matter what and under all circumstances does not absolve defense counsel when they also fail to advise their clients about other potential options that would leave them with a defense to deportation.

Esqueda's failure to completely advise appellant damaged her "ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences" of the plea. (§ 1473.7, subds. (a)(1) & (e)(1).) It is one thing to accept the adverse consequences when you are advised correctly that you have no other options. It is quite another to accept the adverse consequences when you do not know that deportation could be avoided with a plea to a count with exactly the same punishment as the count that mandated

16

deportation. Esqueda told appellant she would be deported—period; this led her to believe she had no defense whatsoever to the prospect of deportation. This was incomplete advice. She also should have been advised that a plea to count 1 would not have made deportation mandatory. In other words, she would have been afforded an opportunity to defend against deportation. Because of counsel's incomplete advice, appellant was ignorant of her options and lost the opportunity to make a meaningful and knowing decision about the immigration consequences of the plea. To add to the confusion, the *Tahl* waiver she signed provided that she "may" face deportation while the prosecutor told her she would be deported.

The trial court found that an immigration-neutral disposition was "not likely" at that point in the proceedings as trial was set to begin. This appears to be speculative and unsupported by the facts. Count 1, the immigration-neutral alternative, carried the same punishment as count 3, the count to which appellant pled. This fact would seem to strengthen appellant's negotiating leverage because a plea to count 1 would not have necessitated a change in the length of the custody sentence the People wanted her to serve as part of the plea agreement. And there is no evidence in the record that the People had specific reason to insist on a plea to count 3 as opposed to count 1.

The trial court also found there was no reason for appellant to believe that an immigration-neutral negotiated disposition was possible. Of course not, as she was never told that a plea to at least one of the charges against her, count 1, was immigration-neutral. If appellant was never told of the option, she had no reason to insist that her counsel try to negotiate a plea to that

17

option on her behalf. We reject this finding as it begs the question of whether she was fully advised of the adverse consequences of her plea.

Finally, the trial court found that what defense counsel told appellant about the immigration consequences was sufficient advisement of the adverse consequences of the plea. We disagree. Omitting the fact that certain charges in the information were immigration-neutral and others were not, is omitting a critical adverse consequence of pleading to the charge mandating deportation.

It is error to tell a defendant they may be deported when deportation is mandatory. (*Vivar*, *supra*, 11 Cal.5th at p. 521.) It is equally insidious to tell a defendant there is no option but deportation when the immigration-neutral charge in the information is staring both attorney and client right in the face. Counsel's advice damaged appellant's ability to defend against deportation and to make a knowing and intelligent decision as to how to resolve the charges against her with respect to her immigration status.

IV.   Prejudice

Appellant must show prejudice in addition to error. "[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar*, *supra*, 11 Cal.5th at p. 529.) "Reasonable probability" does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. (*People v. Soto* (2022) 79 Cal.App.5th 602, 610.) Factors relevant to this inquiry include the defendant's ties to the U.S., the importance

18

the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral disposition was possible. (*Vivar,* at pp. 529–530.) Other factors include the defendant's remaining ties or lack thereof to the home country; the defendant's immigration status in the U.S. at the time of the plea; the defendant's criminal history; and the defendant's employment history. (*People v. Lopez* (2022) 83 Cal.App.5th 698, 714 (*Lopez*).)

Importantly, it is not enough for a defendant simply to declare that she would not have accepted any plea that would result in deportation. The defendant must corroborate such assertions with objective evidence, that is contemporaneous evidence to substantiate her expressed preferences. (*Vivar*, *supra*, 11 Cal.5th*,* at p. 530; *Mejia*, *supra*, 36 Cal.App.5th at p. 872.)

Appellant has met that requirement here. It is undisputed that she has been in the U.S. since 1977 when she arrived at age 14. She received permanent residency status during the amnesty program of the 1980's and applied for U.S. citizenship when she became eligible to do so. She had no remaining ties to Mexico (her father lived in the U.S. as well) and she told her counsel she did not want to be deported because her five children were in the U.S., as was her "whole life." She presented a reasonable explanation for her silence when the prosecutor recited the immigration consequences of the plea in that she, of course, did not know about the possibility of an immigration-neutral disposition because of counsel's failure to tell her about it. She had no familiarity with the criminal justice system as her criminal history consists of a 2000 conviction for driving under

19

the influence of alcohol. There is nothing in the record to suggest she sustained any other convictions in the meantime. To the trial court, she presented letters from family, friends and church members to substantiate her contributions to and active participation in the community, which the trial court did not question.

Here, we conclude appellant's long and deep ties to the U.S., her lack of experience with the criminal justice and immigration systems, and the undisputed concern she expressed to her counsel about the immigration consequences of the plea sufficiently corroborate appellant's claim that her ability to remain in the U.S. was a paramount concern. (See *Lopez, supra,* 83 Cal.App.5th at pp. 703–704 [" 'the prospect of deportation "is an integral part," and often even "the most important part," of a noncitizen defendant's calculus in responding to certain criminal charges' "].) We conclude it is reasonably probable appellant would have rejected the plea agreement had she correctly understood there was an immigration-neutral alternative that did not mandate deportation.

Exercising independent review, we conclude appellant has carried her burden for section 1473.7 relief. Accordingly, we reverse and remand with instructions to grant appellant's motion to vacate her conviction pursuant to section 1473.7, subdivision (e).

20

## DISPOSITION

The order denying appellant's motion to vacate her conviction is reversed.  The matter is remanded to the superior court with directions to grant the motion and vacate the conviction.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



STRATTON, P. J.

We concur:



GRIMES, J.



WILEY, J.